Catron, Judge.
The first of these causes originated in Williamson, the second in Davidson county. Motions were made by the attorney for the government for writs of error on the part of the State to correct the judgments below. Smith was charged by indictment with gaming* by disposing of watches, seals, trinkets, &c. by private lottery. The jury returned a special verdict, and referred the matter of law to the court, who adjudged it gaming and fined the defendant five dollars, but passed no judgment of disqualification, pursuant to the act of 1817, ch. 61, sec. 7, which the attorney general insists the court was bound to do; and asks this court to bring the cause here, to pass such judgment as the court below should have given.
Lane was charged with gaming by private lottery, for money, both by selling out the scheme, and being a ticket holder when drawn, was convicted and -fined fiftv dollars, but no judgment of disqualification passed, for which reason we are also asked to bring the cause here, and pass that judgment upon him. •
The true object of the motion is, to try the question whether private lotteries are within the purview of our statutes to suppress gaming, and the question has been examined at length by counsel on both sides. To what extent did the acts of Assembly intend to prohibit gaming? The act of 1799, ch. 8, is very general, was penned with great skill, and covers almost every supposable case of gaming. It provides, that any person who shall encourage or promote any match, or shall play at any match at cards, dice, billiards or any other game of hazard or address, for money or other valuable thing, on conviction *273 before any Justice of the Peace, shall pay five dollars for every such offence. The act of 1803, ch. 12, sec. 2, declares, that any person who shall play, within the meaning of the act of 1799, shall be subject to indictment, and on conviction shall be fined not less than five, or more than fifty dollars. It is insisted that those who encourage and promote gaming, are not subject to indictment by the act of 1803. This is clearly a mistake, for two reasons: Let us put a case; say four persons sit down to play loo, one of the parties bets nothing himself but plays for another: Here he who plays encourages the match, without betting. To adopt the construction contended for, neither are indictable; still in point of fact, they are both guilty of gaming. In offences inferior to felony, there are no accessaries, all concerned in their commission arc principles. If one man encourages another to assault and beat another person, and stands by and instructs him how to fight, he is equally guilty with him who committed the violence. (2 Hawk. ch. 29, sec. 2. The rule is founded on plain sense, and is as old as the criminal law.
2ndly. The statutes of 1799 and 1S03, were they doubtful, are explained by subsequent acts. The act of 1817 declares, that any person convicted of gaming, or betting upon any game of hazard or address, shall be disqualified to hold any office of trust or profit, for five years; obviously referring to such as might be concerned in gaming, whether they actually played or not.
The act of 1824, ch. 5, refers to gaming generally, and clearly contemplates those who encourage and promote, as well as those who bet. The 5th section provides, that in every case that may arise under any of the statutes to suppress gaming, the court shall interpret said laws as remedial, and not as penal statutes; hence it is the duty of the courts to suppress the mischief, and punish all con. cerned in gambling transactions. Whenever money or other valuable thing is hazarded, and may be lost, or more than the value obtained by chance, it is gaming within the statutes, nor will any name or device take it out of their operation.
*274 The presumption of law is, that every man has acquir-edhis property honestly; and it is the policy of every well regulated government, that he shall not be deprived 0f it without a fair equivalent. This is particularly the case in Republics, where all should be independent in the means of subsistence. Reduce a man to want by gaming or otherwise, and he is no longer free to exercise the elective franchise, but dependent upon the hand that furnishes himself and family with bread. Not only ruin and beggary, but drunkenness, is almost uniformly the ef, feet of gaming; the two vices combined, are more likely to sap the foundations of our institutions, than all others put together. Destroy freedom of thought, and independence of action, in voting at primary elections by the people, and the idea of governing by majorities is a farce, the popular will a delusion, bowing to the dictation of the wealthy minority. The patriot, anxious for the prosperity ofhis country and the durability of her institutions, repines at the thought of seeing the haggard, hungry, and naked gambler, or the besotted drunkard, dragged to the polls and forced to vote according to the beck of his, I might almost say, master; and he a champion of the loo table or faro bank. Jn pecuniary means and political power, knavery rises upon the ruins of honesty and independence. Wheresoever, in these republics, gaming is in any shape tolerated, pauperism, supported by the government, is in nine instances in ten the consequence of it and its kindred vice, drunkenness.
These are a very few of the political considerations going to influence legislation, wholly to suppress every species of gaming. Let us look to some other reasons, partly moral, and still more conclusive, of the correctness of the policy. (
There is implanted in the nature of man, an inclination to gamble, which of all others is most difficult to bring within the restraints of law. The Indian will stake his wife, the ancient German would stake himself, to gratify the passion. (Tacitus, ch. 24. From these, Sir Wm. Blackstone, (4 Com. 171,) supposes our ancestors, *275 «the English,) must have inherited it, and entailed it upon their descendants*
Like other passions, which agitate the great mass of the community, it lies dormant until once aroused, and then, with the contagion and fury of pestilence* it sweeps morals, motives to honest pursuits and industry into the vortex of vice; unhinges the principles oí religion and common honesty; the mind becomes ungovernable, and is destroyed to all useful purposes; chances of successful gambling alone, are looked to for prosperity in life, even for the daily means of subsistence; trembling anxiety for success in lotteries, at the faro bank or loo table, exclude all other thoughts. Expectation is disappointed; more losses are sustained; the highly excited and desperate feelings are kindled by drunkenness, from which arises a wretch, with a wrecklessness and desolation of feeling, that the genius of a Shaks-peare or a Milton could not, nor can any man describe. Swindling, forgery, theft, every crime that extreme necessity and out cast desperation can suggest to a man lost to all the moral ties, though guarded against, are likely shortly to follow in the train. We ask him who has known the world and ways of men as they are, not as they should be, are these not truths? Have you seen the poisoned arrow pierce the devoted victim? Have you seen him driven to desperation, and end his misery in self-destruction? Have you yourself felt the sting of this deadly passion? If you have known and felt these, you can, and do understand us. Who that has gambled much and to excess, has not partly felt and seen in a thousand shapes, the picture of misery here sketched? presenting instances of mental degradation and agony, melancholy as any with which offended Heaven has ever permitted the mind of man tobe afflicted? He who imagines this to be extravagant fancj, has never sat at a loo table, dealing at ten dollars and forfeiting an hundred, for perhaps a week together, or half a week without sleep or ceasing to play. If he has when young, he will appreciate the feeling, (should his head now be gray,) that induces him *276 to look back with awe upon the vices.and misfortunes of his youth; he may be marked as the earnest advocate of highly penal statutes, to deter his son from similar outrages upon the laws of his God, and the laws of this, and we could hope, of every civilized land. We wish to set forth the wise policy of Tennessee, not by declamation but by our knowledge of practical truths; still the melancholy desolation of the mind of man in ruins, can-' not be given as a fact; it must be described. To protect man against the phrensy of his own mind, we have legislated. We are called upon to execute the laws up to their highest penal sanction, .that of depriving a citizen of his equal rights to hold office with his fellow men; we find the law constitutional, imperious in its commands, and are determined firmly and fully to execute it. It is our wish, as also our duty, to inform the people of Tennessee, of the reasons of its enaction, rigorous execution, and the dangers pending over them in case of its violation.
If none of the foregoing reasons existed, the following are amply sufficient, why every vestige of gaming should be suppressed.
The most profligate and abandoned wickedness and profanity, not elsewhere known or heard of, from which morality and religion shrink with horror, are heard at the gaming table, amongst men not disorderly members of society on other occasions; moral man and the-savage beast seem there tobe reduced to a level.
There is not in the history of man, a more disgusting scene than the filthy whiskey house, filled with a horde of gamblers, playing upon benches, heads of kegs, or the floor, cheating, drinking, swearing and fighting. Before the passage of the act of 1817, every youth who attended the county town on court days, could hardly escape this scene of corruption; it soon became familiar to all; it corrupted the morals and destroyed the honesty of tens of thousands! Had Tennessee not used means to suppress such profligacy, she would be a disgrace to civilized communities; yet vyc are told by the attorney for the *277 government, that odium is cast upon prosecutions for gambling. It is the outcry of the outcast grog shop cheat, who smarts under the punishment .received, or which he fears will soon overtake him; abandoned to all morality and decency, himself more odious to all moral- and honest men than the common thief, who takes by littles from the corn-crib and pig-stje; whose abuséis good evidence of integrity and vigilance on the part of the officer denounced. No doubt the whipped thief abuses the solicitor; but then five hundred honest men in return, applaud his skill, vigilance and integrity. Just so it is with the disappointed and punished gambler, who of the two is the more vicious and dangerous man.
All such cheats at cards, and other games, will, in a few years, be punished as men now are for theft. This no man will doubt who has watched the march of public opinion for the last ten or twelve years. Faro was then dealt in the bar-room of the tavern, openly by day and night, even by men who made high pretensions to honor and gentlemanship. The act of 1827, declares them infamous as felons. Why? Because they are presumed to cheat. The rule that punishes private theft, equally should punish open theft, by cheating at any game. He who wins the money of another with marked cards, or loaded dice, is in principle a thief; generally his mental depravity is worse than that of the pilferer; he is unquestionably as fit a subject for infamous punishment.
Gaming, in any arid every shape, lays itself at the root of industrious habits, Where is the man or the woman who will labor at home or abroad patiently to earn a few shillings by the day, when excited by the hope of winning $>10,000, or $>100,000 in a lottery? All rest in anxious expectation of the highest, or a very high prize. Where is the professional man or mechanic, who will toil at his vocation, and acquire by shillings, when his mind is diseased by similar hopes? We know he abandons his calling and relies upon gambling chance for his own and his fámily’s support; the man is a vagrant in mind and conduct, and must beg, swindle, steal, or starve. Govern *278 ments legislate to suppress general evils, without refer , . , , , . ' ence to possible or probable exceptions. Gaming, as a general evil, leads to vicious inclinations, destruction of mora]gj abandonment of industry and honest employment, a loss of self-control and respect. Frauds, forgeries, thefts, make up the black catalogue of crime, the closing scene of which generally ends in highway robbery and murder. The American and European journals are full of cases of the most distressing nature; of bankers, merchants, clerks to banking institutions, men in almost every description of trust, public and private, becoming bankrupts and thieves, to the ruin of themselves and others. Look for the source of their misfortunes, you fiud it in lotteries, loo, faro, thimble, dice and the like.
The act of 1817 (ch. 61, sec. 7,) has declared all persons convicted of gaming,disqualified tohold office for five years from and after the conviction.
This is complained of as a most severe penalty, as it surely is in a government like ours, where office is open to all free white men; it should operate as a great terror, and absolutely to the exclusion of the vice with every man of the least pride or ambition; still the terror held out was not the principle reason that induced the Legislature to pass the act.
A man affected with the passion of play, which he cannot control, is Unfit for public or private trusts. Let us take the officers concerned in the administration of justice for example; judges, justices of the peace, lawyers, clerks of courts, sheriffs and constables. Those who gamble become regardless of all regular employ, neglect their duties, the acquisition of the necessary knowledge to perform them, and generally are a disgrace to the offices they fill. But too often, drunkenness, prostration of self will, and of integrity, are the consequences. Much as we may commiserate the misfortunes of such men, and be disposed as individuals to overlook the aberration, still one thing is certain, they are unfit to be trusted in the management of private matters of importance, much less those of the public. No prudent man would trust the *279 management of his affairs to a man of this description; and is it strange that the state should be equally wise and cautious!
Again: The officer entrusted with public money who gambles, be his intentions ever so honest, is as dangerous so far as the public is concerned, as the knave who deals at faro, or cheats with balls and thimbles. Suppose state treasurers, cashiers and clerks of state banks, clerks of courts, sheriffs, lawyers, and constables, through whose hands most of the money of the country passes, and who hold it as public agents, go to the faro bank or loo table, the cold and calculating gambler arouses and excites to desperation the passion for play; public money is without a moment’s thought staked and lost, the community grossly cheated without the possibility of redress, or of knowing an injury has been inflicted, until it is too late.
It matters little in such cases whether the play be fair or foul, the gambler who plays upon cold calculation for money, needs neither marks nor tricks; his superior skill is equal to all these. It maybe we are bad casuists, but we have ever apprehended, when we saw a sober calculating gambler playing with a young drunken and extravagant companion, whom he could overreach by superior skill and sober cunning,'that he was no better than the itinerant knave with his faro box and cheating glove, whom he was pleased to call black leg; indeed of the two the former is beyond doubt the more dangerous antagonist; when betting with him vigilance is asleep, perhaps drunk, and honor relied upon; a virtue that no man ever had, as we solemnly believe, who played for the love of money only.
At the honorable loo table then, the public money is in just as much danger, perhaps more, than at the cheating faro bank. These are the prominent reasons for excluding gamblers from office. If gamblers are to fill public trusts, and be keepers of the public money, the state would do well to appoint experienced sharpers, well supplied with marked packs and faro banks, who would be pretty certain not to lose it for want of skill, and not so *280 likely to embezzle it, as the inexperienced novice would be to lose it. The absurdity of trusting the one or the other, is equally manifest.
]\|any w¡u exclaim, the statute could not have meant us, whose ofience is loo slight to deserve any punishment, much less so severe a penalty as the loss of our dearest rights as citizens of a free country. The legislature have said, and we repeat it, if you have ever gambled fora dollar,“thou art the man” intended. You have gambled, and will again do so; your example may have caused, or may cause many to gamble; the severe punishment inflicted upon you will deter yourself and others from a repetition of the offence; the object of the law is to blast the vice in the bud.
It has been suggested to us that the provisions of the act of 1817, ch. 61, declaring those convicted of gaming disqualified to hold office, was perhaps unconstitutional. By the act of 1807, ch. 73, those convicted of perjury forgery, larceny, &c. are declared infamous; it is necessarily part of the sentence upon every conviction for felony; the convict is excluded from an oath, or holding an office.
By the act of 1827 ch. 40, the dealer at faro, the exhibitor of the thimble, or grandmother’s trick, is declared infamous upon conviction, as felons are by the act of 1807. Will any man doubt the power of the legislature so to declare any one convicted of gaming? The power to disqualify partially,as certainly follows as that the whole in-eludes all the parts.
The court below supposed it discretionary whether disqualification should follow the conviction. The statute of 1817 is as positive in its injunctions as that of 1807 or 1827, and proceeds upon the same policy. No discretion is left with the court in either case. The state demands the protection, and the court dare not withhold it.
If the circuit court errs, as it clearly has done, it is the duty of the attorney general to appeal and have the judgment corrected, as was done in the causes of the State vs» *281 Fields, and vs. Waterhouse, reported in Martin and Yergers Reports.
The next consideration is, was the circuit court correct in pronouncing these lotteries gaming within our statutes? Whenever money or other valuable thing, is hazarded and may be lost, or-more than the value obtained, and dependent upon chance, the transaction is gambling. We have taken upon ourselves to frame a rule for application to all cases, drawn from the fountain head, without aid from the various opinions of the fathers of the church or of the law, to which the argument has referred us; we presume ourselves at least equally qualified with the former to draw up a maxim. Some of these we are assured will say, perhaps have said upon their oaths, that they never considered a lottery gaming. Doubtless such have been moral all their lives, and never have played at sweep loo for money, horses, watches,or the like, nor even at hustlecap for a drink; if they have, however, we will convince (hem of their mistake, to prove which, we will put a case of sweep loo: say a watch is played for by five at $20 each; this is paid to the owner, the watch becomes the common property of the players, hands are dealt out until one is superior to the other four, and wins all the shares. Raffling is the same in principle.
How does a lottery compare with these? Say five hundred tickets are sold at two dollars each, the seller of the property staked, gets the money, the property is owned in common by the ticket holders; certain numbers are fixed to certain pieces of property, (say a watch soldffor $100 amongst other articles,) the corresponding number on the watch is drawn by A, he takes all the shares in the watch as at sweep lco, gets fifty times the value of his money, and fifty other tickets of course draw nothing. Cards are but numbered pieces of paper, and chances in getting certain numbers, determine success.
Faro is as simple a lottery as those before us. The dealer and his antagonist stake equal sums of money, each upon a certain card; another pack is dealt off alternately, one to the dealer, one to the player, until *282 the card bet upon comes out; the side to which it falls wins the money staked.
Suppose five men put down $¡10 each, and draw from the pack for the highest card, (a common mode of play,) . it is a simple lottery.
The interest in the property obtained by purchase in. common, may be lost, or more than the interest may be obtained, dependant upon chance; hence it is clearly within the description of gambling^pbove laid down.
It is earnestly insisted that the kct of 1803 .could never have intended to include lotteries, because from its passage till within a year, it has never been enforced to suppress this mode of selling property.
Before the passage of the act of 1817, all gaming was only indictable in the county courts, some small fine, not to exceed fifty dollars, was the penalty, and a prosecutor required in every instance. The consequence was, that in town, whilst the courts of justice were sitting, taverns, whiskey houses, all public places, were the open scenes, day and night, of the most dissolute, riotous and ruinous gambling. For want of a prosecutor, and adequate power in the courts to punish, it was not, nor could it he suppressed; lotteries escaped with other gambling.
After the passage of the act of 1817, it hid itself in private places, none but players could prove it, these protected themselves from giving evidence under the excuse that they would criminate themselves; the vice was lessened; still to a great extent it went unpunished. Much to the credit of his foresight, the solicitor of this district, urged to the legislature the necessity of passing the act of 1824, compelling any of those who gambled, to come forward and give evidence. This act has brought to light hidden gaming of every description, lotteries inclusive.
It is next insisted that the act of 1809, ch. 39, subjecting the seller and ticket holders to a penalty by qui tarn action, for double the amount of the scheme, is evidence that the act of 1803 was not intended to apply to lotteries. The idea of restraining a lottery for $10,000 worth of property, by a small fine, was in 1809, as at this day *283 it is, ridiculous. Lotteries are more extensive in their consequences, and at least equally pernicious with gaming at cards, in corrupting the morals, prostrating industrious and steady habits, and wasting the property, and that too of a credulous portion of the community, little inclined to gamble otherwise; hence the additional penalties. It was stated in argument, as a notorious fact, that in the two counties from which these causes come up, young and old, male and female, black and white, had been and now were gambling together in lotteries; we are also told, (but hope it is a mistake,) that members of churches have been led astray by this popular delusion. Decent men and women have been overreached, without reflection. Lotteries are gambling, and odious gambling. The master and mistress from the parlor, the cook from the kitchen, the ostler from the stable, the boarding school miss, the boy at his grammar, the apprentice boy; every age, colour, and condition of men, women and children, are found gambling together. It draws in the young and unwary; associates them with idle and vicious vagabonds, degrades them inevitably; it may be, and no doubt generally is attended with the grossest cheats practiced upon the giddy and helpless ticket holders. The seller of the lottery may give them something or nothing at pleasure, keep every thing worth having himself, or award it to friends. To talk of honesty and fair dealing, in such a transaction, would be worse than idle. No man who sells a lottery would.get credit for being honest; every experienced mind presumes cheats of some kind, the articles sold and gambled for put off at two, three or four prices, their real qualities misrepresented, brass passed off for'gold; unsound property for sound, the refuse trumpery if obtained, is of itself worthless, and wholly useless to the winner; a cheat at any price. The master, perhaps a blacksmith, draws a ring by far two small foij any finger on his own hand, yet quite too large for his wife’s use; the spruce young gentleman draws a doll; the cook a brass watch, which she supposes gold; the ostler a pair of lady’s ear-rings ; the mistress an iron sword with *284 a brass scabbard; the young master a pair of spectacles; the young lady -who goes in for a patent lever gold watch, comes out with a pair of b rass spurs; placing the parties concerned in an attitude of broad caricature, wholly beyond the reach of exposure. Still the spirit to' game is aroused, equally by considerable success, or by the entire want of it. The chances are again and again tried, until the passion destroys the morals and property of the gambler. Other bad consequci.ces ensue. The cook with her watch refuses to play scullion, the ostler to curry and feed; the wheel, the knitting, the garment, plough and working tools, are laid aside; usc/ul labour treated as vulgar drudgery, beneath the refined notions of gold watches, tens of thousands in money, and other things of great beauty and value to be obtained in the lottery. A single fortunate ticket presently to come out, is to make up for all this idleness and extravagance. Vagrancy of mind and worthlessness, are accompaniments as certainly, as that unwary youth has passions beyond the reach of self-control.
It is urged that the seller of the property by lottery, does the drawing himself; that in fact the ticket holders have no concern in the matter, save buying the tickets, which is not gaming; that those who win nothing, at least have nothing further to do with it. Such is the conclusion our brother judge has come to; we think far otherwise.
The vender of the articles gambled for, may, and in practice generally does, draw for all. This aggravates the evil; the deluded and credulous ticket holders may be cheated by him at discretion if he choose, still he is their agent, and draws for them at their bidding. If a company sit down at loo, and one play for another who is absent and who risked the money, though absent, would not the latter gamble?
The evil would be lessened were all the ticket holders compelled to come forward and draw for themselves; when cook, mistress, ostler, boatman, school boy, spinster, and street bully; all orders, conditions and colours, of *285 men, women and children, mothers, daughters, sons, fa-thcrs and slaves, would be found gambling and wrangling together, making up a rabble that the town constable would whip off, as a riotous mob and nuisance. Pride and common decency would correct the evil, to some extent, but for the ingenious contrivance of drawing by agent, and risking all frauds.
Disposing of property by lottery, is in every point of view, a most odious species of gaming, without a shadow of excuse why it should not be punished. In Lane’s case the writ of error wiH issue; in Smith’s an appeal in error was prayed below by him to the next court, to which time it must lie over, when the State may bring it up, if the defendant does not.
Whyte, Judge, concurred.
Peck, Judge.
I am of opinion, that the drawing of a private lottery, is not within the letter, the spirit, or meaning of any of our acts of assembly against gaming.
I come to this conclusion, 1st, from the fact that the evil of drawing private lotteries has been considered of by the Legislature, and, it has made provision for suppressing them. In the opinion of the Legislature, the means provided were ample, and if the evil still exists, it is not for a defect of the law, hut for want of energy in carrying it into effect.
If it is said that no person will bring the action for the penalty, which is the remedy prescribed by the Legislature, I answer, that is no reason why this court should by a forced and unnatural construction, attempt to make it an offence of another class, in order to turn a civil proceeding into a criminal one. It cannot be, that any lawyer viewing the laws against gaming, and at the same time connecting them with those against lotteries, would come to the conclusion that the offences were the same*
To construe them so at this day, would in effect be (as has , been argued) to make the law; and to enforce it would he to give it an expost facto operation.
2d. To make an act punishable as a crime, the will or *288 the Legislature to be consistent. To pass laws of great severity against gaming, and at the same time to- ■ lerate it under, a modified form by authorizing a lottery or lotteries, would be inconsistent. It would in fact be licensing gaming, if lotteries be gaming.
It is said that a similarity may be traced between lotteries and some of the methods or plans pursued in gaming; that it depends upon hazard and chance: so do all insurances depend upon hazard and chance. What is the difference?
I speak on the subject of gaming with diffidence. My habits have never led me into it, even so far as to learn a single game beyond the backgammon board; and even on that, I have never attained so much skill as to venture the smallest sum; though sometimes I may have purchased lottery tickets.
Writ of error ordered to issue.